FILED

**IN THE UNITED STATES DISTRICT COURT**   2023 JAN 11  PM 3:19
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**          CLERK US DISTRICT COURT
                                 MIDDLE DISTRICT FLORIDA
                                 FORT MYERS FLORIDA

United States of America, State of
Florida, and the State of Minnesota,
*ex rel.* Lisa Loscalzo, a Florida resident,

        Plaintiffs,

v.                                         CASE NO.: 2:20-cv-295-FtM-38NPM
                                           **AMENDED COMPLAINT**
                                           **FILED *IN CAMERA* AND**
                                           **UNDER SEAL PURSUANT TO 31**
                                           **U.S.C. § 3730(b)**

Bluestone Physician Services of
Florida, LLC, Bluestone Physician Services, P.A.,
Bluestone National, LLC,
Timothy Koehler, Sarah Keenan and Todd
Stivland, all Minnesota residents,
WindRose Health Investors, LLC, WindRose
Medical Properties LP, The Blueventure Fund,
and Sandbox Industries,

        Defendants.
_____/

### I.    INTRODUCTION

1)    This is a civil action brought by Lisa Loscalzo ("Relator"), on her own

behalf and on behalf of the United States of America ("United States"), the State of

Florida ("Florida"), and the State of Minnesota ("Minnesota") against Bluestone

Physician Services of Florida, LLC ("Bluestone Florida"), Bluestone Physician

Services, P.A. ("Bluestone Physician"), Bluestone National, LLC ("Bluestone

National") (collectively, Bluestone Florida, Bluestone Physician and Bluestone

National shall be referred to as "Bluestone"), Timothy Koehler ("Koehler"), Sarah

Keenan ("Keenan") and Todd Stivland ("Stivland"), all Minnesota residents, WindRose Health Investors, LLC ("WindRose"), and WindRose Medical Properties, LP ("WindRose Medical") (collectively, WindRose and WindRose Medical shall be referred to as "WindRose Companies"), The Blueventure Fund (a collaboration between Blue Cross and Blue Shield Companies, Blue Cross Blue Shield Association and Sandbox) ("Blueventure"), and Sandbox Industries ("Sandbox") (collectively, WindRose, Blueventure and Sandbox shall be referred to as "Private Equity Defendants")(collectively, Bluestone, Koehler, Keenan Stivland, and Private Equity Defendants shall be referred to as "Defendants"), under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), the Florida False Claims Act, Florida §§ 68.081 *et seq.*, (the "Florida False Claims Act"), and the Minnesota False Claims Act, ch.15C.01, *et seq.* (the "Minnesota False Claims Act"), to recover damages sustained by and penalties owed to the United States, the State of Florida, and the State of Minnesota, as the result of Defendants having knowingly presented or caused to be presented or conspired to present, to the United States, the State of Florida, and the State of Minnesota, false claims for the payment of funds disbursed under the Medicare Program, 42 U.S.C. §§ 1395c-1395i-4 and the Medicaid Program, 42 U.S.C. §§ 1396 *et seq.*, in excess of the amounts to which Defendants were lawfully entitled.

2)     Defendants Bluestone provide healthcare providers for primary and geriatric care to residents of Florida, Minnesota, Wisconsin and Virginia Assisted Living Facilities, memory care units and group homes (collectively referred to as

2

"ALFs"). None of the healthcare providers have offices at the ALFs. The practice is 100% mobile. The claims alleged herein are based on Bluestone's scheme to have their healthcare providers create records seeking payments from Medicare and Medicaid for higher, more expensive levels of medical services than those actually performed, commonly referred to as "upcoding" and for seeking payments for medically unnecessary services. Moreover, Bluestone's scheme, known as the "Bluestone Model of Care" (hereinafter, the "Bluestone Model"[1]), mandates the healthcare providers (including physicians, nurse practitioners and physician's assistants) see the vast majority of patients in their panel at least one time per month, an additional time for an annual visit, and also for any acute care issues that may arise in between the monthly appointments. The acute care visits occur only when the provider is already in the building. The monthly appointments and at least a portion of the acute care visits are not based on medical necessity according to a physician's independent judgment, but rather Defendants' fraudulent policy aimed at generating more income. The providers make no informed judgment prior to scheduling the patients for their monthly visits. Nor can the providers possess a sincerely held or reasonable judgment of medical necessity for a visit which they schedule as a routine several weeks in advance.

3)       Another core component of the Bluestone Model is the billing for chronic care management ("CCM"[2]). This category relates to provider's time spent

---

[1] The Bluestone Model will be discussed more fully in the factual section of this Amended Complaint.

[2] CCM will be described more fully in the factual section of this Amended Complaint.

3

outside face-to face time spent with the patient.  For the relevant time period,
Defendants were the highest biller of CCM in the country.  Despite the fact that
providers were seeing these chronic care patients with an unusually high
frequency, their CCM numbers went up, not down.  Defendants submit bills for
these upcoded and medically unnecessary visits and CCM time to the Government
for payment.

      4)     The Bluestone Model remains a main feature of Bluestone's website
as of the date of filing this Amended Complaint.

      5)     Defendants WindRose, Blueventure and Sandbox each invested in
and/or managed investments in Bluestone.  WindRose holds a majority interest in
Bluestone.  The Private Equity Defendants were aware of the Bluestone Model at
the time of their investments.  Indeed, the Bluestone Model prompted their
investments.  Moreover, the Private Equity Defendants boast that their portfolios
include healthcare industry companies.  Even a modicum of due diligence would
have revealed the Bluestone Model's non-compliance with Medicare and Medicaid
regulations.  The Private Equity Defendants' reckless failure to identify the fraud
and/or reckless disregard of the patent fraud of the Bluestone Model raises their
conduct to the level of fraud.

      6)     Relator worked for Bluestone Florida as the general manager for the
Florida markets from 2016 until November 2019.  She oversaw the business
operations of the practice as well as the building and growth of the Florida market.
She worked hand-in-hand with Bluestone Physician's owners and executives and

4

reported to the Bluestone Physician's Chief Operating Officer, Koehler. Defendants trained Relator in the Bluestone Model, which model Defendants crafted in Minnesota and brought to Florida in 2015 when Bluestone Florida was opened.

7) The Bluestone training team trains its providers in the Bluestone Model from the Minnesota location, although some of the Bluestone trainers live in Florida and Wisconsin. Bluestone developed Bluestone University (which includes the Bluestone Model) as one tool that they use in the training process. One of the Bluestone University "pillars" describes the Bluestone Model to include Prevention/Chronic Care Management, monthly visits, CCM, Traditional Care Management ("TCM") visits, Annual Wellness Visits, and acute visits. During the onboarding process, new providers meet with Defendant Keenan and Jessie Waks, a Minnesota-based nurse practitioner and the Director of Clinical Practice. During that meeting, Ms. Keenan or Ms. Waks typically provide the new practitioner with Bluestone Model training.

8) Approximately 70% - 80% of Bluestone's patients are Medicare or Medicaid beneficiaries. As a result of the fraudulent practices described herein, Medicare and Medicaid overpaid for a significant portion of the payments they made to Bluestone. Relator approximates that damages exceed $1,000,000.00.

9) The WindRose Companies, through WindRose, completed an "equity recapitalization" of Bluestone, announced on April 14, 2021. The WindRose

5

Companies either recklessly failed to discover the patent fraud of the Bluestone Model, or recklessly disregarded evidence of such fraud.

10)     On August 2, 2021, Blueventure gave a "strategic investment" to Bluestone, including WindRose as Bluestone's owner.  In the press release regarding same, Defendant Stivland states that Blueventure recognizes the importance of Bluestone's integrated care model, further commenting that Blueventure's "deep payor relationships and knowledge-based care" will bring value to Bliuestone and WindRose as they grow their market.  Blueventure either recklessly failed to discover the patent fraud of the Bluestone Model, or recklessly disregarded evidence of such fraud.

11)     Sandbox Industires is a firm independent from Blueventure. Sandbox provides a full range of investment management services to Blueventure. Sandbox either recklessly failed to discover the patent fraud of the Bluestone Model, or recklessly disregarded evidence of such fraud.

12)     The PE Defendants are all well-versed in the healthcare arena, rendering their failure to identify the fraud, or recklessly disregarding such fraud, entirely inexcusable.

II.     **JURISDICTION AND VENUE**

13)     This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a), 28 U.S.C. §§ 1331, 1345, and 1367.

14)     Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1391(b) and 1391(c), because Defendants do business in this District and because many of the acts complained of herein took place in this District.

15)     This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

16)     To the extent that there has been a public disclosure, the Relator is an original source under 31 U.S.C. §3730(e)(4). Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

**III.   PARTIES**

17)     Plaintiffs are the United States of America, on behalf of its agencies the United States Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), the State of Florida on behalf of its agency the Department of Health ("FL DOH"), and the State of Minnesota on behalf of its agency the Department of Human Services ("MN DHS").

18)     Relator Lisa Loscalzo is an individual who is a Florida resident ("Relator").

19)     Defendant Bluestone Physician Services, P.A. is a Minnesota corporation, doing business throughout Minnesota, with its principal place of

7

business at 270 N Main Street, Suite #300, Stillwater, Minnesota 55082. Defendant Bluestone Physician Services, P.A. owns the Minnesota market.

20)   Defendant Bluestone Physician Services of Florida, LLC is a Florida limited liability corporation and a subsidiary of Bluestone Physician Services, P.A., doing business throughout Florida, with its principal business address at 10150 Highland Manor Drive, Tampa, Florida 33610.

21)   Bluestone National, LLC is a foreign limited liability corporation doing business throughout Florida and Wisconsin, with its principal business address at 270 N Main Street, Suite #300, Stillwater, Minnesota 55082.

22)   Defendant Timothy Koehler is the President of Bluestone National and Chief Operating Officer of Bluestone Physician and is a resident of Minnesota and engaged in the wrongful behavior throughout Minnesota, Florida and Wisconsin.  Upon information and belief, Defendant Koehler owns a majority percentage of Bluestone Florida and of Bluestone National.

23)   Defendant Todd Stivland, M.D. is the Chief Executive Officer of Bluestone and is a resident of Minnesota and engaged in the wrongful behavior throughout Minnesota and Florida. Defendant Stivland owns Bluestone Physician Services, Inc.

24)   Defendant Sarah Keenan is the Chief Clinical Officer of Bluestone and is a resident of Minnesota and engaged in the wrongful behavior throughout Minnesota and Florida.  Defendant Keenan owns a share of Bluestone Physician Services, Inc.

25)     Defendant WindRose Health Investors LLC is a foreign limited liability corporation, doing business in Florida, Minnesota, and other states, with its principal business address at 320 Park Avenue, Floor 33, New York, New York 10022. According to their April 14, 2021 press release, WindRose owned a majority position in Bluestone from the time of the equity recapitalization.

26)     Defendant WindRose Medical Properties LP, upon information and belief, is the parent corporation of WindRose, with its principal business address at 320 Park Avenue, Floor 33, New York, New York 10022

27)     Defendant Blueventure Fund is a collaboration between Blue Cross and Blue Shield Companies, Blue Cross Blue Shield Association and Sandbox. Its headquarters is located at 225 North Michigan Avenue, Chicago, Illinois, 60601.

28)     Defendant Sandbox is the investment management arm of Blueventure Fund. Its headquarters is located at 1000 W Fulton Market, Suite 213, Chicago, Illinois 60607.

## IV.    THE LAW

### a.    Federal False Claims Act

29)     The FCA provides, in pertinent part, that:

(1) [A]ny person who –

(A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or
...

(G) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $11,181and not more than $22,363, as adjusted . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729; 28 CFR § 85.5.  *See also* Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note); Pub. Law 104-410; 64 Fed. Reg. 47,099 (1999).

30)     Fraud is knowingly and willfully executing, or attempting to execute, a scheme or artifice to defraud any health care benefit program or to obtain (by means of false or fraudulent pretenses, representations, or promises) any of the money or property owned by, or under the custody or control of, any health care benefit program. 18 U.S.C. § 1347.

31)     The term "knowingly" means that a person "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  Thus, "no proof of specific intent to defraud is required" to impose liability under the False Claims Act.  31 U.S.C. § 3729(b)(1)(B).

32)     The FCA also broadly defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides

any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

33)    The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.  The complaint must be filed under seal without service on any Defendants.  The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action.  31 U.S.C. § 3730(b).

### b.    The Medicare Program

34)    Medicare is a federal government-funded medical assistance program, primarily benefitting the elderly and the disabled, which was established in 1965 by Title XVIII of the Social Security Act.  *See* 42 U.S.C. §§ 1395 *et seq.* Medicare is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), which is a division of the U.S. Department of Health and Human Services ("HHS").

35)    A health care provider who has provided a *reimbursable service* for a Medicare beneficiary, submits a claim to the Medicare Carrier.  The Medicare program defines "carrier" as "an entity that has a contract with CMS to determine and make Medicare payments for Part B benefits payable on a charge basis and to

11

perform other related functions." 42 C.F.R. sec. 400.202.  The Medicare Carrier submits the claim to CMS for payment.

36)    CMS pays claims for reimbursement in accordance with the Social Security Act, the Code of Federal Regulations and Medicare Rules and Regulations, as promulgated by CMS.  CMS distributes the Medicare Rules and Regulations to the providers.  CMS periodically distributes Medicare Rules and Regulations to the providers through Program Memoranda and Program Transmittals.  CMS also provides Medicare Rules and Regulations to providers via CMS's internet website. Medicare enters into provider agreements with health care providers and physicians that govern the health care provider's participation in the program. Intermediaries (in this instance, First Coast Service Options, Inc.) regularly release updates to their interpretation of CMS rules and regulations.

37)    Providers submit claims for payment electronically utilizing the CMS-1500 form.

38)    When filing the electronic equivalent of the CMS-1500 form, a provider certifies that:

> ...the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare....

("Medicare Certification").

39)    Furthermore, every Medicare enrollment application contains a "Certification Statement" that an appointed official for the provider, such as its

chief executive officer, must sign. The appointed official is required to certify, in

pertinent part, that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Act), and on the supplier's compliance with all applicable conditions of participation in Medicare.

CMS 855B form.

40)   When enrolling to participate in the Medicare program, the provider

must certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Act), and on the supplier's compliance with all applicable conditions of participation in Medicare.

CMS 855i form, ¶4

41)   In that same form, the provider certifies that he or she understands

the penalties for falsifying information in connection with Medicare claims. *Id.*,

¶3.

42)   Part A of the Medicare Program provides federal payment for patient

institutional care, including hospital, skilled nursing facility, and home healthcare.

*See* 42 U.S.C. §§ 1395c-1395i-4.   Part B of the Medicare Program provides supplemental insurance coverage for medical and other services that Part A does not cover.  42 U.S.C. §§ 1395j-1395w-4.

43)     Under the Medicare Program, CMS reimburses health care providers for outpatient services after the services are rendered.

44)     Under Medicare, in order to be reimbursable a service must be "reasonable and necessary for the prevention of illness ..." 42 U.S.C. § 1395y(a)(1)(A), or for the "diagnosis or treatment of illness or injury or to improve the functioning of a malformed body part...." 42 C.F.R. § 411.15(k)(1).

45)     When submitting claims for reimbursement, CMS mandates that providers utilize the Healthcare Common Procedure Coding System ("HCPCS") to indicate the medical services rendered.  HCPCS is a uniform method for healthcare providers and medical suppliers to report professional services, procedures and supplies.  The medical services codes of HCPCS are known as "Common Procedure Terminology" Codes ("CPT Codes").

46)     Medical providers may not bill the government for medically unnecessary services, including services that actually harm a patient or are performed for no reason other than obtaining a profit. *See, e.g., United States ex rel. Kneepkins v. Gambro Healthcare, Inc.,* 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000) (procedures chosen solely for defendant's economic gain are not "medically necessary"). Health care providers must certify that services or items ordered or provided to patients will be provided "economically and only when, and to the

extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care" and "will be supported by evidence of medical necessity and quality." 42 U.S.C. § 1320c-5(a)(1) -(3).

47)    By submitting claims to Medicare, a provider certifies, among other things, that the services were rendered to the beneficiary and that the services were medically necessary and comply with all Medicare laws and regulations.

### c.    Healthcare Industry Definition of Medical Necessity

48)    The American Medical Association defines medical necessity as:

Health care services or products that a *prudent physician* would provide to a patient for the purpose or preventing, diagnosing or treating an illness, injury, disease or its symptoms in a manner that is: (a) in accordance with *generally accepted standards* of medical practice; (b) *clinically appropriate* in terms of type, frequency, extent, site and duration; and (c) not primarily for the economic benefit of the health plans and purchasers or for the convenience of the patient, treating physician, or other health care provider. [3]

49)    Medicare.gov Glossary defines medical necessary as "health care services or supplies needed to diagnose or treat an illness, injury, condition, disease or its symptoms and that meet accepted standards of medicine."

### d.    Medicaid

50)    Medicaid is a joint federal-state program created in 1965 that provides health care benefits for eligible beneficiaries, primarily the poor and disabled.  The federal portion of each state's Medicaid payments, known as the Federal Medical

---

[3] AMA Statement to the Institute of Medicine's Committee on Determination of Essential Health Benefits. January 14, 2011.

Assistance Percentage ("FMAP"), is based on the state's *per capita* income compared to the national average. *See* 42 U.S.C. § 1396d(b). Among the states, FMAP is at least 50 percent and is as high as 83 percent. The states pay the remaining portion of the cost to provide benefits under the Medicaid program.

51) The FMAP for Florida is 62 percent. The FMAP for Minnesota is 50 percent.

52) At the federal level, CMS administers Medicaid. Medicaid is used by 49 states, each of which has a State Medicaid agency to administer the program.

   e.   **Florida Admin Code §59G-1.010(166)**

53) In order to submit claims to Medicaid, providers must sign a Certification Statement attesting that the care, services, or supplies for which they are submitting claims to Medicaid were furnished "in accordance with applicable federal and state laws and regulations," 42 U.S.C. § 1396, et seq.; Fla. Stat. § 409.907(1). Further, providers must attest that the services were "medically necessary" and personally furnished by the certifying provider, or at his or her direction, were incident to and under the direct supervision of the certifying provider. CMS-1500; Florida Medicaid Provider General Handbook (July 2012), 2-11.

54) In order to be reimbursed, Medicaid requires that services provided be medically necessary, which means among other things that they not "be furnished in a manner primarily intended for the convenience of the recipient, the

recipient's caretaker or the provider." Physician Services Coverage and Limitations Handbook ("PSCLH"), Ch. 2, 2-1 (2014).

55)  Florida Statute defines "medical necessity" as something that meets the following conditions:

- Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain;
- Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs;
- Be consistent with generally accepted professional medical standards as determined by the Medicaid program, and not experimental or investigational;
- Be reflective of the level of service that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available; and
- Be furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider.

Florida Statute sec. 409.9131(2)(b).

### f.    **Minnesota Administrative Rules 9505.0175 (Definitions) Subpart 25**

56)  Minnesota Administrative Rules define medical necessity as:

"Medically necessary" or "medical necessity" means a health service that is consistent with the recipient's diagnosis or condition and:
A. is recognized as the prevailing standard or current practice by the provider's peer group; and
B. is rendered in response to a life threatening condition or pain; or to treat an injury, illness, or infection; or to treat a condition that could result in physical or mental disability; or to care for the mother and child through the maternity period; or to achieve a level of physical or mental function consistent with prevailing community standards for diagnosis or condition; or
C. is a preventive health service under part 9505.0355.

Minn. Admin. R. 9505.0175, Subp. 25.

17

### g.    First Coast Medicare Intermediary

57)    First Coast Service Options, Inc. (hereinafter "First Coast") serves as the Medicare intermediary for Florida.  First Coast provides information to the industry regarding the submission of Medicare claims in Florida.  First Coast sets forth numerous coverage terms in its portal, including several relevant in the instant case.

### h.    Home and Domiciliary[4] Visits

58)    First Coast describes home and domiciliary visits as:

> A home or domiciliary visit includes a patient history, examination, problem solving and decision making in various levels depending upon a patient's need and diagnosis. Visits may also be performed as counseling or coordination of care if medically necessary outside the office environment and are an integral part of a continuum of care. The patients seen may have chronic conditions, may be disabled, either physically or mentally, making access to a traditional office visit very difficult, or may have limited support systems. The home or domiciliary visit in turn can lead to improved medical care by identification of unmet needs, coordination of treatment with appropriate referrals and potential reduction of acute exacerbations of medical conditions, resulting in less frequent trips to the hospital or emergency rooms.

LCD L33817
https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=33817&ver=20&DocID=L33817&bc=AAAAABAAAAAA&

59)    Covered indications: Home and domiciliary visits must meet the following criteria:

> 1. The service/visit must be medically reasonable and necessary **and not for the convenience of the physician**

---

[4] An ALF is considered to be a resident's domiciliary.

**or qualified NPP.**

**2. The service must be of equal quality to a similar service provided in an office. The frequency of visits required to address any given clinical problem should be dictated by medical necessity rather than site of service. It is expected that the frequency of visits for any given medical problem addressed in the home setting will not exceed that of an office setting, except on rare occasion.**

3. Each visit must meet the applicable medical standards of practice.

4. The service is of such nature that it could not be provided by a Visiting Nurse/Home Health Services Agency under the Home Health Benefit. ... The E/M service will not be considered medically necessary when it is performed only to provide supervision for a visiting nurse/home health agency visit(s).

5. A qualified physician or qualified non-physician practitioner must perform the service.

6. If the service is provided to a patient for the first time, the patient, his/her delegate, or another medical provider managing the patient's care, must request the service. The visiting provider may not directly solicit referrals. An example of inappropriate solicitation is knocking on residents' doors or placing calls to residents on the telephone to offer medical care services when there has been no referral from another professional that is already involved in the case.

7. If laboratory and diagnostic tests are performed during the course of home or domiciliary care visits, they must meet reasonable and necessary criteria. Medical reasons for repeat testing must be clearly documented. Performance of multiple or common tests without clear evidence of medical need of the patient or changes in the treatment regimen based on the lab tests would not be considered reasonable and necessary as mandated by 42CFR 410.32.

\* \* \*

9. Training of domiciliary staff is <u>not</u> considered medically necessary.

*Id.* (<u>emphasis</u> <u>added</u>).

60)     With regard to documenting home and domiciliary visits, First Coast

directs:

Visits to multiple patients by the same physician or physicians/NPPs of the same group may occur on the same date of service, but each service must meet the medical needs of the individual patient. **Each visit must stand on its own and the medical necessity of the visit must be supported in documentation.** Services provided in the home or domiciliary setting must not unnecessarily duplicate services provided to the patient by other practitioners, regardless of whether those practitioners provide the service in the office, facility or home/domiciliary setting. Home/domiciliary services provided for the same diagnosis, same condition or same episode of care as services provided by other practitioners, regardless of the site of service, may constitute concurrent or duplicative care. When such visits are provided, the record must clearly document the medical necessity of such services. When documentation is lacking, the services may be considered not medically necessary.

If the total number of Home and Domiciliary E/M services exceeds what could reasonably be provided, based upon the applicable standard of care and the component requirements for those E/M codes, those E/M codes may be subject to medical review. For follow-up visits, the physician or qualified NPP or that provider's medical group practice must have an ongoing patient-physician relationship with the beneficiary. Exceptions include patients who are traveling through an area and are not residents in the location where they are being seen and patients who are being seen in their homes or domiciles for urgent or episodic illness....

The physician/qualified non-physician practitioner must be the provider of record and be responsible for managing the

> entire disease process addressed in the visit. If the
> home/domiciliary care is being provided by other than the
> provider of record for a limited condition that would not
> typically prevent return to an office environment after
> recovery, the service will be presumed to be not medically
> necessary, unless the provider of record requests a
> consultation and the care is medically necessary and clearly
> documented in the medical record.

*Id.* (emphasis added)

61)     First Coast directs the following requirements when billing under CPT

code 99327:

> DOMICILIARY OR REST HOME VISIT FOR THE
> EVALUATION AND MANAGEMENT OF A NEW PATIENT,
> WHICH REQUIRES THESE 3 KEY COMPONENTS: A
> COMPREHENSIVE HISTORY; A COMPREHENSIVE
> EXAMINATION; AND MEDICAL DECISION MAKING OF
> MODERATE COMPLEXITY. COUNSELING AND/OR
> COORDINATION OF CARE WITH OTHER PHYSICIANS,
> OTHER QUALIFIED HEALTH CARE PROFESSIONALS, OR
> AGENCIES ARE PROVIDED CONSISTENT WITH THE
> NATURE OF THE PROBLEM(S) AND THE PATIENT'S
> AND/OR FAMILY'S NEEDS. USUALLY, THE PRESENTING
> PROBLEM(S) ARE OF HIGH SEVERITY. TYPICALLY, 60
> MINUTES ARE SPENT WITH THE PATIENT AND/OR
> FAMILY OR CAREGIVER.

https://www.cms.gov/medicare-coverage-database/details/lcd-
details.aspx?LCDId=33817&ver=20&DocID=L33817&bc=AAAAABAAAAA
A&

62)     First Coast directs the following requirements when billing under CPT

code 99337:

> DOMICILIARY OR REST HOME VISIT FOR THE
> EVALUATION AND MANAGEMENT OF AN ESTABLISHED
> PATIENT, WHICH REQUIRES AT LEAST 2 OF THESE 3 KEY
> COMPONENTS: A COMPREHENSIVE INTERVAL HISTORY;

A COMPREHENSIVE EXAMINATION; MEDICAL DECISION MAKING OF MODERATE TO HIGH COMPLEXITY. COUNSELING AND/OR COORDINATION OF CARE WITH OTHER PHYSICIANS, OTHER QUALIFIED HEALTH CARE PROFESSIONALS, OR AGENCIES ARE PROVIDED CONSISTENT WITH THE NATURE OF THE PROBLEM(S) AND THE PATIENT'S AND/OR FAMILY'S NEEDS. USUALLY, THE PRESENTING PROBLEM(S) ARE OF MODERATE TO HIGH SEVERITY. THE PATIENT MAY BE UNSTABLE OR MAY HAVE DEVELOPED A SIGNIFICANT NEW PROBLEM REQUIRING IMMEDIATE PHYSICIAN ATTENTION. TYPICALLY, 60 MINUTES ARE SPENT WITH THE PATIENT AND/OR FAMILY OR CAREGIVER.

*Id.*

63)   "Medical record documentation must support a medically necessary

visit and made available upon request." *Id.*

64)   Local Coverage Article: Billing and Coding: E&M Home and

Domiciliary Visits (A56520), LCD33817, provides:

> When services are provided in ANY setting, medically reasonable and necessary criteria must be met. **Standing visits (i.e., standing order "q 3 months") are not considered medically necessary unless the patient's medical condition is clearly documented and they are only considered to be medically necessary when they relate to acceptable standards of medical practice or published medical guidelines for a specific diagnosis.** This must be validated each time by a statement documented in the clinical record of the patient's status. Each visit must stand-alone and be supported in the documentation.[5]
>
> Many elderly patients have chronic conditions, such as hypertension, diabetes, orthopedic conditions, and abnormalities of the toenails. **The mere presence of inactive or chronic conditions does not constitute**

---

[5] Contrary to this directive, the Bluestone Model directs the providers to schedule the patients in the EMR system a month in advance.  The typical entry in the EMR system is "patient being seen for multiple chronic conditions."

**medical necessity for any setting (home, rest home, office, etc.). There must be a chief complaint or a specific reasonable and medically necessary need for each visit.** In support of this, the documentation of each patient encounter must include:

- Reason for the encounter and relevant history
- Physical examination findings, and prior diagnostic test results, if applicable
- Assessment, clinical impression, or diagnosis
- Medical plan of care

Thus, a payable diagnosis alone does not support medical necessity of ANY service.

**Medical necessity must exist for each individual visit. The visit will be regarded as a visit of convenience in the following instances (unless the medical record clearly documents the necessity for the visit):**

- **The initial visit and the reason for subsequent visits must not be driven by group visits to one domiciliary facility without other factors as mentioned above** (e.g., the clear support of medical necessity for each individual visit).

- The record does not clearly demonstrate that the patient, his/her delegate or another clinician involved in the case sought the initial service.

- **The service is being provided at a frequency that exceeds that which is typically provided in the office and acceptable standards of medical practice.**

- The service was solicited.

*Id.* (emphasis added).

23

65)     In order for a provider to be eligible for reimbursement under Medicare, pursuant to "provisions of the Balanced Budget Act of 1997, Physicians (MDs) and Qualified non-physicians Practitioners (NPPs) must be practicing within the scope of State law and may also bill for home and domiciliary visits." *Id.*

66)     "Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code.  It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted." Medicare Claims Processing Manual, Ch. 12, section 30.6. Medicare and Medicaid do not cover routine examinations and related services.  PR-49 is the Code for rejecting a bill for a service that is a "routine or preventative exam or a diagnostic procedure done in conjunction with a routine or preventative exam." https://medicare.fcso.com/FAQs/Answers/271409.asp.

### i.     Florida Retaliation Provisions (Fla. Stat. Sec. 68.088)

67)     Section 68.088 issues protections for whistleblowers.  Specifically, that section provides:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this act, including investigation for initiation of, testimony for, or assistance in an action filed or to be filed under this act, shall have a cause of action under s. 112.3187 [Adverse action against [public] employee for disclosing information of specified nature prohibited; employee remedy and relief].

24

### j.     Minnesota Medicare Provisions

68)    In Minnesota, "[a] health service must be medically necessary to be a

covered service. Services listed as provided by a physician in this chapter may be

provided by other health care professionals if the service is within the scope of

their practice as defined in the Minnesota Statutes." Minnesota Department of.

Health Provider Handbook ("MN Provider Handbook").

https://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONV

ERSION&RevisionSelectionMethod=LatestReleased&dDocName=ID_008926

69)    The Minnesota Department of Health defines "concurrent care

services" as:

> The provision of similar services (for example, hospital visits to the
> same patient by more than one physician on the same day). If a
> consulting physician subsequently assumes the responsibility for a
> portion of patient management, it is considered concurrent care.

*Id.*

70)    The Minnesota Provider Handbook further provides:

> MHCP pays concurrent care when the medical condition of the
> member requires the services of more than one physician. Generally,
> a member's condition that requires physician input in more than one
> specialty area establishes medical necessity for concurrent care.

*Id.*

71)    The Minnesota Provider Handbook explicitly states:

> MHCP will not pay for concurrent care when one of the following
> occur:

25

- The physician makes a routine call at the request of the member and family or as a matter of personal interest

- Available information does not support the medical necessity of concurrent care

*Id.*

72)     With regard to medical conference or counseling as part of E/M code,

the Minnesota Department of Health provides:

> Physician services related to counseling are covered as part of the E/M codes if the counseling is conducted face-to-face with the patient, relative, or guardian.
>
> When counseling or coordination of care dominates (more than 50 percent) the encounter between the physician and the patient or family, time may be considered the key or controlling factor to qualify for a particular level of E/M service. Medical record documentation must reflect the content of the counseling, coordination of care, and the amount of time spent in counseling or coordination.

*Id.*

73)     Noncovered preventative services include "services that deal with external, social or environmental factors that do not directly address the member's physical or mental health." *Id.*

### k.     **Minnesota Guidelines**

74)     ALFs fall under the category of Community Based Residential Facility

("CBRF"). Wis. Stat. 50.01(1g);   https://www.dhs.wisconsin.gov/guide/cbrf.html

75)     The Community Care handbook defines fraud, waste and abuse

("FWA") as:

- **Fraud** – is defined as an intentional deception, false statement or misrepresentation made individual with knowledge that the deception could result in unauthorized benefit to that individual or another person. Claims submitted for services not provided are considered fraudulent.
- **Waste** – is defined as failing to control costs or using Medicare or Medicaid funds to pay for services that are not determined to be necessary.
- **Abuse** – is defined as practices that are inconsistent with professional standards of care; medical necessity; or sound fiscal, business or medical practices. The primary difference between fraud and abuse is "intent". Poor recordkeeping, lack of understanding of care responsibilities or reporting obligations may result in an investigation for abuse.

FWA can occur at any point and by anyone involved in the care of program members. Members may also be involved in FWA activities, including:

- misrepresentation of medical conditions to obtain additional or unnecessary services, supplies, equipment, or medications;
- failure to disclose information that may affect eligibility

Community Care Provider Handbook, page 25
https://communitycareinc.org/docs/default-source/provider-clinical-guidelines/provider-handbook.pdf?sfvrsn=10

### l.   **Minnesota Retaliation Provision (2019 Minnesota Statutes, Section 15C.145)**

76)   Section 15C.145 of the Minnesota Statutes protects whistleblowers from retaliation by their employers.  Specifically, the statue provides:

An employee, contractor, or agent is entitled to all relief necessary to make that employee, contractor, or agent whole if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of

an action under this chapter or other efforts to stop one or more violations of this chapter.

### m. Due Diligence Requirements for Private Equity Firms

77) Private equity firms cannot turn a blind eye toward or recklessly disregard extant and continuing fraud. *See, e.g.*, U.S. ex rel. Martino-Fleming, 540 F.Supp. 3d 103 (D. Mass. 2021) (order on cross motions for summary judgment).

78) Best practices of private equity firms require the exercise of due diligence prior to entering a deal and a continued watch over compliance matters thereafter.

79) Indeed, investors cannot turn "a blind eye where the submission of false claims by another entity was the foreseeable result of a business practice" and "a defendant may be liable if it operates under a policy that causes others to present false claims." *Id.*

80) "Due diligence is the reasonable care, which is typically in the form of a thorough investigation, taken by a rational individual prior to completing a deal." https://dealroom.net/faq/private-equity-investment-strategies#faq-3

81) "The lack of publicly available metrics on private companies makes due diligence an absolute necessity for private equity firms." *Id.*

82) Experts in public equity funds recommend that funds fully understand "[t]he business model of the company … before making any investment." *Id.* This includes a full evaluation of the business model. *Id.*

83)   Private Equity Fund executives' control, leadership, experience and direction in the business support a finding of liability for private equity funds. *United States ex rel. Cho and Baker v. Surgery Partners, Inc. et al* 17-cv-983 (M.D. Fla), Complaint filed Apr. 25, 2017. So too does Private Equity executives' seats on the business' board of directors, engagement in planning, budgeting and financing the business, and knowledge that Medicare and/or Medicaid reimbursement fuel the business. *Id.*

84)   Intentional or reckless disregard of fraud rises to the level of fraud for purposes of the False Claims Act. 31 U.S.C. § 3729(b)(1)(A).

## V.   THE FACTS

### a.   The Bluestone Model

85)   Bluestone providers provide primary and geriatric care services to ALF residents in Florida, Minnesota, Wisconsin and Virginia. No Bluestone brick and mortar clinics exist, though Bluestone Florida has an office in Tampa which provides back-office support (patient enrollment, billing, medical records, processing) for the entire State of Florida.

86)   Bluestone's Minnesota's Stillwater location houses typical corporate functions, including human resources, finance, administration, IT, clinical services, credentialing, project management and field support operations for the Minnesota and Wisconsin markets.

87)   Bluestone's business began in Minnesota in 2006. In 2016, Defendants wanted to expand its Florida market (Bluestone had acquired Geriatric

Management Associates in Brooksville, Florida in 2015), and brought the Bluestone Model to Florida. Defendants hired Relator in July 2016 as General Manager for the Florida market. During her tenure, she oversaw the Florida business operations and was responsible to grow the Florida market. Bluestone Physician owners and officers develop and control the activities of Bluestone Florida.

88) Throughout the hiring process, and several times thereafter, Defendant Koehler made Relator aware that Defendant Stivland and others always had the goal of selling the business to investors. In the late spring and summer of 2019, while Defendant Koehler was in Florida, he told Relator that they were actively speaking to investor groups and further told her that these investor groups liked Bluestone's business model and the performance, profitability and growth the company demonstrated.

89) Bluestone Florida providers provide care throughout central[6] and northeast Florida and treat approximately 4500 patients in about 200 assisted living facilities ("ALFs"). About 70% - 80% of the Bluestone patient panel receive their health insurance through either Medicare or Medicaid.

90) The Bluestone Model groups providers into "Provider Teams" led by a physician and including one to three nurse practitioners or physician assistants as well as support staff. For more details regarding the Provider Teams, see https://bluestonemd.com/provider-teams-fl/. Defendants bonus their providers

---

[6] Bluestone providers treat patients as far south as Port Charlotte, Florida.

based on the Provider Team's productivity.  Productivity is directly correlated to the number of patients a provider sees, as well as the level of care that provider codes for each patient he or she sees.

91)     Bluestone providers service ALFs within a tight geographic area, with the stated goal of limiting "windshield time" – time spent in providers' cars travelling to various ALFs.  Typically, providers visit two buildings per day, one in the morning and one in the afternoon.  They spend approximately two to four hours in each ALF at each visit.

92)     Defendants expect a physician or nurse practitioner to carry a patient panel of about 200 patients by the end of his or her first 12 months with Bluestone.  Defendants expect providers to visit each ALF in his/her panel weekly (or a minimum of bi-weekly) on the same day to build their panel.  Defendants develop provider schedules to correspond with this expectation.

93)     Defendants describe the Bluestone Model as a prevention and chronic care management program.

94)     Defendants use Bluestone University, a training and information intranet site to train those physicians, nurse practitioners, physicians assistants, and clinical assistants (who schedule patients) who work for them.  The training includes seven pillars, such as the Model of Care, efficient team building, and ensuring exceeding quality measures[7] (based on frequency of patient visits).

---

[7] Quality measures are standards that providers are held to in order to qualify for Medicare incentive payments which are typically known as MIPS  (Medicare Incentive Payment System)

Notably, in order to make sure the providers achieve "quality measures" Defendants regularly send providers quality workplans during the third and fourth quarters, initially monthly and then, as year's end approaches, weekly.

95) Bluestone Physician trains all new providers in the market where they will be working. Trainers comes to the providers in their markets. Also, members of the Minnesota office do some training telephonically. In addition to training the providers on the electronic medical records ("EMR") system, training also includes scheduling patients and quality measures.[8]

96) Defendant Keenan commented on numerous occasions that one of the reasons Bluestone providers do so well on quality measures is because they have a 'captive audience' and see the patient every month or as often as they need to without the issue of cancelled appointments. She typically made these remarks during presentations to potential partners. One specific instance was to the Community Health Systems' (Bayfront) Accountable Care Organization ("ACO[9]") representatives when Bluestone was in discussions about joining that ACO.

97) Defendants house all provider performance reports in a program called Analyzer. Analyzer extracts data from the EMR system. Bluestone use

---

[8] The Clinical Services Department annually identifies quality measures that it pulls from a list of measures provided by CMS. They include things like A1C below a certain level, anti-depressant medication management, and use of high-risk meds in the elderly.

[9] An accountable care organization (ACO) is an association of hospitals, healthcare providers and insurers in which all parties voluntarily assume financial and medical responsibility for Medicare patients. The purpose of an ACO is to enable care coordination that allows a patient to receive the right care at the right time while reducing the risk of medical errors and duplicate services. https://searchhealthit.techtarget.com/definition/ACO

eClinicalWorks as the practice management system. Upon information and belief, Defendants will be changing to the Aprima EMR system in 2020.

98) Reporting includes provider "scorecards" which set forth the number of visits the provider makes per month, the average revenue per visit, the monthly revenue, the monthly CCM census, patient demographics and coding trends.

99) Defendants generally expect providers to see their patients on a monthly basis, regardless of the medical necessity based on the patient's diagnosis or needs. In direct contravention of Medicare mandates, Defendants' executives expect that providers' schedules will be completed a month ahead of time so that Defendants can make financial projections based on the estimated number of provider visits. Providers schedule the patients for routine visits in the monthly schedule section of the EMR. This pattern of misconduct supports the fact that the providers, for the most part if not entirely, do not exercise legitimate clinical judgment in advance of scheduling these routine monthly visits.

100) The Bluestone Model divides each ALF's patient group into sub-groups. Providers see each patient within a sub-group the same time every month (for example, the morning of the second Tuesday of the month). The majority of providers see patients Monday through Thursday and use Friday as an administrative day.

101) In some cases, the providers ask the ALF staff to bring all of the patients into one large room and line them up so they can see them one after another, which is for the provider's convenience. Sometimes these "medical visits"

take place in the dining room, hallways or in an outside courtyard.  This practice compromises both the patients' health and privacy.

102)  Defendants' policy is to have the providers complete their closing notes by the 10th of the following month, though the expectation is that the providers close their charts by the following week after a visit.

103)  Defendants send providers a monthly "patients not seen" report[10]. For those patients who did not receive a monthly provider visit, the Defendants ask the provider why a visit did not occur.

104)  No regulation or requirement exists mandating monthly visits to ALF patients.  In fact, the opposite is true and medical necessity is the guidepost for all visits.

105)  The Bluestone Model results in about 13 patient visits per day (200 patients divided by 16 workdays per month) for nurse practitioners and 15 patient visits per day (240 patients divided by 16 workdays per month) for physicians. Such visits include monthly routine visits (which, by their nature, are not medically necessary), annual wellness visits (one time per year), transitions of care visits (when a patient changes his/her care setting), acute or same day visits for acute issues (only when the provider is at the facility already), new patient visits, physician oversight visits, face to face visits for start of home health or hospice services, and any visits for procedures such as nail clipping, ear wax removal, or

---

[10] The monthly report contains data pulled from the EMR and downloaded into a spreadsheet.  The report is then sent to providers and their clinical assistants.

joint injections. Under this framework, providers commonly see patients two to four times per month, or as many as 20 times per year. This amount far exceeds the amount of visits such patients would be seen in an office setting which is the standard of care for "medical necessity."

106)   Sometime in late 2018 or early 2019, Bluestone implemented "physician oversight visits." On a quarterly basis, the physician provider sees the patients on his or her team member's patient panel. This is in addition to the team members' patient visits and results in three to four more visits per year per patient, over and above the already unnecessary monthly visits.[11]

107)   During Relator's tenure, providers, including Defendant Stivland, frequently joked that they enjoyed seeing patients in the memory care units because they could line the patients up around the room and process them quickly.

108)   Defendant Stivland ranked Memory Care units as the top type of facilities to work because providers could see the highest number of patients in the shortest amount of time. He ranked ALFs second and independent living facilities third under the same rubric.

109)   Bluestone pays physicians on a "production model" after one year with Bluestone. Under this model, all of the revenue the provider's "team" generates goes into a team bucket. The team must generate a certain level of revenue before becoming bonus eligible. Physicians typically make a bonus of $15,000 - $20,000 quarterly on top of their $200,000 annual draw. Some

---

[11] These duplicative visits violate the First Coast directive as set forth herein in paragraph 51.

physicians make over $30,000 in quarterly bonuses. Nurse practitioners and physician assistants typically make an additional $5,000 to $20,000 in quarterly bonuses.

110) Because of this bonus structure, it is not uncommon for some providers to see 18-20 patients per day, resulting in 270-300 visits per month. A new hire in Minnesota, April Abrahamson, was seeing about 400 patients per month, electing to see patients on Fridays. Sara Bohn, M.D., a Florida provider, sees over 300 patients per month. Hetal Patel and Andrea Kichline, both APRNs, see about 300 patients per month. In October 2019, Florida providers scheduled 6086 visits although the patient census for Bluestone Florida is only 4500. Notably, about 96% of all scheduled visits get closed and billed.

111) Bluestone describes its patient base in Minnesota, Florida and Wisconsin as comprised of very frail, highly complex elderly patients with multiple chronic conditions in their late stages of life.

112) Defendants therefore expect providers to bill patient encounters at the highest levels (99336 and 99337 for established patients and 99327 and 99328 for new patients).

113) When Florida providers pushed back at this higher-level billing codes, Defendants told them that the patient makeup was the same as in Minnesota so Florida providers should bill the same codes.

36

114)   Defendants distribute Provider Scorecards on a monthly basis through a system called Kubit.  These scorecards show individual provider code trends versus company-wide coding trends.

115)   Company-wide coding trends showed a distribution of 60% at the 99337 level and 35% at the 99336 level for established patients.[12]

116)   In light of this breakdown, and assuming a provider sees 15 patients per day, that would entail 830 minutes of face-to-face patient time, or 13.8 hours. This does not comport with the fact that the providers actually visit two ALFs per day, spending an average of two to four hours in each ALF.

117)   Relator's conversations with providers further reveal the disconnect between the reported patient visits and actual patient visits. For example, both Dr. Phil Fioret and ARNP Teresa Passalacqua (who was the Director of Clinical Services at the time) repeatedly told Relator that very little changes in the patients' medical conditions because they are seen so frequently.  Dr. Fioret also commented that this fact made the practice very boring.

118)   Providers typically spend about 10-15 minutes with a patient, perhaps a little longer if the patient is new or if his or her family members are present. Various providers informed Relator that the patient visits are mostly social in nature and are routine (because they happen every month) so not much changes from visit to visit.  Also, the clinical assistants almost always update the EMR by

---

[12] Notably, it is easier to get a higher-level code with patients who have do not resuscitate orders ("DNRs"). Providers are, therefore,  encouraged to have end of life conversations as soon as possible in order to secure a DNR.

pulling the chart notes[13] forward from month to month and visit to visit. They typically do this a day before the patient is scheduled to be seen.

### b.   CCM Duplicative Billings.

119)   Defendants also expect the providers to exploit their CCM billings, and bill the full amount permitted under Medicare.

120)   As a result of this mandate, Defendants' providers bill the highest CCM rates in the country. Due to the significant billing to the higher E&M codes, one would expect the CCM number to go down because CCM claims are billed for all of the activities that a provider performs on behalf of the patient outside of the face-to-face encounter. It includes things like communicating with family, reviewing lab and diagnostic results, and communicating with the pharmacy. Because the providers see patients so frequently, the providers should perform most, if not all, of these activities during the time of the visit. Additionally, providers bill for the higher codes, so they should have time to complete all of the CCM activities during the course of the longer visits. If they do not, then that demonstrates that the providers are not spending the appropriate amount of time with the patient during the face-to-face visits.

121)   Further, last year Defendants piloted a position in Minnesota entitled "director of care management". Defendants recently advertised a director or care

---

[13] Both clinical assistants and providers write the chart notes.

management position in Florida.[14]  The director of care management is an office-based nurse who 'supports' the care teams in the field, educating new and current patients and families about the Bluestone Care Model, Bluestone Bridge, and discussing the living environment of ALFs (most of which are administrative tasks).  The director of care management also answers questions and helps with communication with the physician and their nurse.

122)   Defendants intend that CCM billing covers the costs of director of care management position.  This position allows Defendants to duplicate CCM billing that the providers are already submitting.[15]

### c.    The Triggering Audit

123)   In August or September 2019, Medicare audited Bluestone provider Sarah Bohn, one of Defendants' top billers.   Medicare requested the notes regarding one visit each for a variety of patients. As a result of the way in which Medicare requested the information (one visit per patient), Medicare was not made aware that each patient was seeing his/her provider many more times than mandated or medically necessary.

124)  This audit caused Relator to review the Medicare regulations governing ALF visits.  Upon her review of the regulations, Relator determined that the Bluestone Model was in direct contravention of relevant Medicare rules and

---

[14] https://www.glassdoor.com/Job/tampa-director-care-management-jobs-SRCH_IL.0,5_IC1154429_KO6,30.htm?rdserp=true&jl=3497380652&guid=00000170afca7c989b7b226121f3d245&pos=104&src=GD_JOB_AD&srs=EI_JOBS&s=21&ao=352789
[15] Because Defendants have now launched the position in Florida, one can ascertain that the CCM billings covered the position in Minnesota.

regulations, specifically regarding medical necessity.   As a cornerstone of the Bluestone Model, Bluestone instructs their practitioners to see patients routinely and set up regular schedules regardless of patient need. Bluestone compensates these providers based on such schedules.

125)   In September 2019, Relator brought this information to the attention of Theresa Passalacqua, the clinical director.   Relator expressed concern because the Bluestone Model did not comply with those regulations, and, in fact, Bluestone rewarded its practitioners for acting in contravention of the regulations.

126)   Passalacqua, who reports directly to Defendant Keenan, indicated that she too was uncomfortable with this information.

### d.    Retaliation against Relator

127)   Defendants terminated Relator in November 2019.   Prior to her termination, Defendants held Relator in high regard.  Her evaluations support this.

128)   Nevertheless, because Relator spoke up about the fraud and Defendants suspected she was investigating it, Defendants terminated her. Defendants fabricated an accusation that one of the nurse practitioners under Relator's supervision, Viv Evans, was billing for patients whom she did not see. Ms. Evans fully denied this claim.

129)   When Bluestone terminated Relator, Defendant Koheler told Relator that Bluestone was going to report Ms. Evans to the licensing board, and that she would have to pay back claims, and would lose her license.  Defendant Keenan was present for this conversation.

130) In fact, Bluestone's investigation of Ms. Evans lasted one week in November 2019, and turned up nothing. A February 2020 review of Ms. Evans' license shows absolutely no complaints and no disciplinary actions. Her license remains clear and active.

131) Defendants did not provide Relator with an opportunity to explain the fabricated allegations. The circumstances surrounding her termination were atypical from the way Bluestone normally handled such matters and were fully related to Relator's complaints regarding the fraudulent Bluestone Model.

### e. WindLove's Involvement in the Fraud.

132) Bluestone's expressed goal was to sell Bluestone to a private equity company to capitalize its growth. Defendant Koehler mentioned this to Relator during the hiring process. He further stated that Defendant Stivland was not ready to sell at the time of her hire because they wished to grow the Florida market more first. Further, Bluestone's offer letter and long-term incentive compensation agreement with Relator reflect such goal.

133) In the spring or summer of 2019, on two occasions, Defendant Koheler advised Relator that Bluestone was in active conversations with investor groups. As of that time, Florida had turned profitable.

134) As a private equity fund, WindRose was required to engage in due diligence of Bluestone's practices and business model, among other areas. Moreover, WindRose could not turn a blind eye to the ongoing fraud.

135) WindRose was aware of Bluestone's business model as the press release regarding the equity recaptializtion evinces. https://www.prnewswire.com/news-releases/windrose-health-investors-completes-recapitalization-of-bluestone-physician-services-301268524.html Therein, WindRose identifies "regularly scheduled visits" as a benefit of Bluestone's model. Further, WindRose notes that Bluestone deploys its multi-dimensional care model" throughout Minnestoa, Wisconsin, Florida and Virginia. *Id.*

136) WindRose further notes that Bluestone's founder and chief executive officer, Defendant Stivland, and the executive leadership team will maintain a "significant minority position", with WindRose holding the majority interest. *Id.* At that time, the Bluestone executives had been aware of the fraudulent nature of the Bluestone Model for approximately two years.

137) Further, WindRose executives held a majority of the Bluestone Board of Directors seats.

138) In the press release, Bluestone notes as incredibly valuable "WindRose's deep relationships with healthcare payors and experience in value-based care." *Id.* Thus, WindRose implicitly had knowledge of the Medicare and Medicaid regulations.

139) WindRose's leadership understood that Bluestone's revenues were and remain tied to Medicare and Medicaid, and that those sources of funding had terms and conditions of payment.

140) Finally, WindRose boasts that it "focuses on companies with profitable business models and a demonstrated ability to deliver cost-effective solutions." *Id.*

141) At the time of acquisition and following the acquisition, WindRose was aware the Bluestone Model, which, for the reasons stated above, was fraudulent.

142) WindRose either failed to use its resources and experience to conduct even a modicum of due diligence on the legality of Bluestone's business model, or intentionally or recklessly disregarded its illegality.

143) Further, WindRose knew or should have known that Medicare and Medicaid had certain requirements attendant to home and domiciliary visits as set forth in paragraphs 56-58 above, for example, and that Bluestone was not complying with those requirements.

144) WindRose's majority holdings in Bluestone confer upon it a duty and the ability to rectify noncompliance and take all measures necessary to comport with compliance.   Rather than rectify the non-compliance, however, WindRose continued the fraud and filing of false claims.

### f.   Blueventure's and Sandbox's involvement in the Fraud.

145) Blueventure was fully aware of Bluestone's Model, as set forth in a quote by its Vice President, Andrew Boyd, stating "we are thrilled to support Bluestone team as their care model, outcomes and growth strategy clearly align

with our focus areas at BVH". https://www.pehub.com/blue-venture-fund-invests-in-windrose-backed-bluestone-physician-services/

146)   As a private equity fund, Blueventure was required to engage in due diligence of Bluestone's practices and business model, among other areas.  This holds true for Sandbox as well.  Moreover, Blueventure could not turn a blind eye to the ongoing fraud.

147)   At the time the investment and thereafter, Blueventure (including Sandbox) was aware of Bluestone's business model, which, for the reasons stated above, was fraudulent.

148)   Blueventure's leadership understood that Bluestone's revenues were tied to Medicare and Medicaid, and that those sources of funding had terms and conditions of payment.

149)   Blueventure and Sandbox (as the investment manager arm) either failed to use its resources and experience to conduct even a modicum of due diligence on the legality of Bluestone's business model, or intentionally or recklessly disregarded its illegality.

150)   Further, Blueventure, and Sandbox knew or should have known that Medicare and Medicaid had certain requirements attendant to home and domicillary visits as set forth in paragraphs 58-66 above, for example.

VI.   **CONCLUSION**

**Defendants' Violations of Statutes and Regulations**

151)   In sum, Bluestone's  Model of Care directly contravenes the federal and state medical necessity requirements.  Providers conduct routine monthly visits which they schedule a month in advance, all as a matter of convenience and not based on medical necessity for each individual patient.  With the possible exception of acute care visits[16], the providers exercise no legitimate clinical judgment in scheduling patients' visits.

152)   Further, despite Bluestone's claims that their patient base suffers from chronic conditions, the mere existence of chronic conditions in the elderly patient base does not support medical necessity, and each visit must demonstrate and have a documented chief complaint or a specific reasonable and medically necessary need for the visit.  Moreover, the Providers almost always bill at the higher CPT codes though their visits do not warrant and the notes do not document the need for such increased billings.

153)   Also, the creation of the physician oversight visit translates to duplicate care, for which Defendants are not entitled to bill.   Bluestone's business model supports and compensates those providers that produce the most revenue at the expense of the "medical necessity" requirement.

154)   The director of care management also results in duplicative care and billings to Medicare for CCM services.

---

[16] These visits likely also lack medical necessity insofar as the providers only see these "acute care" patients if they are already in the facility where such patient resides.

155) Relator had made the individual Defendants aware of these aspects of the fraud in 2019.

156) Further, Defendants terminated Relator for the actions she took in furtherance of claims under the federal, Florida and Minnesota False Claims Acts.

157) The Private Equity investors knew that compliance with regulations pertaining to home and domiciliary care was material to payment and that the government typically does not pay where the provider fails to satisfy the conditions.

158) WindRose and Blueventure's intentional or reckless disregard of the legality of the Bluestone Model prior to investing, and the failure to correct noncompliance after acquiring/investing in Bluestone, and their deliberate or reckless disregard of the ongoing fraud, allowed the continued filing of false claims, rendering Defendants responsible under the False Claims Act.

159) Continuing with the Bluestone Model caused Defendants to submit false claims. Further, submitting false claims was the foreseeable result of continuing with Bluestone's business model.

### Count I.

#### Violations of the Federal False Claims Act
#### (31 U.S.C. § 3729 (a)(1)(A))
#### Presenting False Claims for Payment

160) The United States incorporates by reference paragraphs 1 through 159 as if fully set forth herein.

161)   The United States seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

162)   Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in connection with the submission of their requests for reimbursement under the Medicare and Medicaid programs.

163)   Defendants caused the United States to reimburse Medicare and Medicaid funds under the Medicare program because of their fraudulent conduct.

164)   By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

### Count II.

### Violations of the Federal False Claims Act
### (31 U.S.C. § 3729 (a)(1)(B))
### Use of False Statements

165)   The United States incorporates by reference paragraphs 1 through 159 as if fully set forth herein.

166)   The United States seeks relief against Defendants under Section § 3729(a)(2) of the False Claims Act, 31 U.S.C. 3729(a)(1)(B).

167)   Defendants knowingly made, used, or caused to be made or used, false records or statements material to false and fraudulent claims, in connection with the submission of its requests for reimbursement under the Medicare and Medicaid programs.

168)  Defendants caused the United States to reimburse Medicare and Medicaid funds under the Medicare and Medicaid program because of their fraudulent conduct.

169)  By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

### Count III.

### Violations of the Federal False Claims Act
### (31 U.S.C. § 3729 (a)(1)(G))
### Use of False Statements

170)  The United States incorporates by reference paragraphs 1 through 159 as if fully set forth herein.

171)  The United States seeks relief against Defendants under Section § 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

172)  Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in connection with the submission of their requests for reimbursement under the Medicare and Medicaid programs.

173)  Defendants caused the United States to reimburse Medicare and Medicaid funds under the Medicare and Medicaid programs because of their fraudulent conduct.

174) By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

### Count IV.

### Violations of the False Claims Act
### (31 U.S.C. §3729(a)(1)(C))
### Conspiracy to Commit a Violation

175) Plaintiff re-alleges and incorporates by reference herein the allegations contained in paragraphs 1 through 159 above.

176) The United States seeks relief against Defendants under the False Claims Act, 31 U.S.C. 3729(a)(1)(C).

177) As set forth above, from prior to 2016 through the present, Defendants authorized, reviewed, approved, caused the filing of and/or failed to rectify claims for reimbursement to the Medicare and Medicaid Programs, which claims contained false records and/or statements. Defendants then submitted the claims to Medicare and Medicaid, certifying that the claims for reimbursement they submitted were truthful, correct, and that the claims identified services that were billed in compliance with the law.

178) As a result of the false certifications submitted, Defendants obtained payments from the United States, the State of Florida and the State of Minnesota for services that were upcoded and/or lacked medical necessity.

179) Defendants conspired to defraud the Government by getting false or fraudulent claims allowed or paid.

180) Defendants acted knowingly, with deliberate ignorance, or with

reckless disregard for the truth in making and using, or causing to be made and used, false records and statements, in order to get false or fraudulent claims paid or approved by the United States in connection with the submission of its requests for reimbursement under the Medicare, Medicaid and other federal healthcare programs.

181)   As a result of Defendants' false statements, Defendants obtained payments from the United States, the State of Florida and the State of Minnesota for services that were upcoded and/or lacked medical necessity.

182)   By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

### Count V.

### Violation of the False Claims Act
### (31 U.S.C. § 3730(h))
### Retaliation

183)   Plaintiff re-alleges and incorporates by reference herein the allegations contained in paragraphs 1 through 159 above

184)   Relator investigated and advised Defendants of the false and fraudulent claims being presented by Defendants.

185)   Relator's investigation involved matters which were, or were reasonably likely to be, viable actions under the False Claims Act.

186)   Defendants had explicit or implicit knowledge of Relator's protected activity.

187)   Defendants eventually terminated Relator for his actions.

50

188)   By reason of Defendants' acts and conduct, Relator has been damaged in a substantial amount to be determined at trial.

### Count VI.

### Violation of the Florida False Claims Act
### (Fla. Stat. §§ 68.081 *et seq.*)

189)   The State of Florida incorporates by reference paragraphs 1 through 170 as if fully set forth herein.

190)   This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*

191)   By virtue of the submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented, or conspired to present, to an officer or employee of an agency false or fraudulent claims for the improper payment or approval and used false or fraudulent records to accomplish this purpose.

192)   The State of Florida, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

193)   By reason of these payments, the State of Florida has been damaged, and continues to be damaged in a substantial amount.

194)   By reason of Defendants' acts and conduct, the State of Florida has been damaged in a substantial amount to be determined at trial.

### Count VII.

### Violations of the Florida False Claims Act

**Retaliation (Fla. Stat. sec. 68.088)**

195)   The State of Florida incorporates by reference paragraphs 1 through 159 as if fully set forth herein.

196)   Relator seeks relief against Defendants under Florida Statute section 68.088 of the Florida False Claims Act.

197)   Relator investigated and advised Defendants of the false and fraudulent claims being presented by Defendants.

198)   Relator's investigation involved matters which were, or were reasonably likely to be, viable actions under the False Claims Act.

199)   Defendants had explicit or implicit knowledge of Relator's protected activity. Defendants were displeased that Relator refused to continue engaging in the fraudulent conduct.

200)   Defendants eventually terminated Relator for her actions.

201)   By reason of Defendants' acts and conduct, Relator has been damaged in a substantial amount to be determined at trial.

**Count VIII.**

**Violations of the Minnesota False Claims Act**
**(Minn. Stat. ch.15C.01, *et seq.*)**

202) The State of Minnesota incorporates by reference paragraphs 1 through 159 as if fully set forth herein.

203) This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. ch.15C.01, *et seq.*

204)  By virtue of the submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented, or conspired to present, to an officer or employee of an agency false or fraudulent claims for the improper payment or approval and used false or fraudulent records to accomplish this purpose.

205)  The State of Minnesota unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

206)  By reason of these payments, the State of Minnesota has been damaged, and continues to be damaged in a substantial amount.

207)  By reason of Defendants' acts and conduct, the State of Minnesota has been damaged in a substantial amount to be determined at trial.

## Count IX.

### Violations of the Minnesota False Claims Act
### Retaliation
### (Minn. Stat. ch.15C.145)

208)  Relator incorporates by reference paragraphs 1- 159 as if fully set forth herein.

209)  Relator seeks relief against Defendants under Minnesota Statute 15C.145 of the Minnesota False Claims Act.

210)  Relator investigated and advised Defendants of the false and fraudulent claims being presented by Defendants.

53

211)   Relator's investigation involved matters which were, or were reasonably likely to be, viable actions under the False Claims Act.

212)   Defendants had explicit or implicit knowledge of Relator's protected activity. Defendants were displeased that Relator refused to continue engaging in the fraudulent conduct.

213)   Defendants eventually terminated Relator for her actions.

214)   By reason of Defendants' acts and conduct, Relator has been damaged in a substantial amount to be determined at trial.

## Prayer for Relief

WHEREFORE, Plaintiffs, the United States, the State of Florida, and the State of Minnesota, *ex rel*. Lisa Loscalzo request that judgment be entered in their favor and against Defendants as follows:

(a)   On the First, Second, Third and Fourth Claims for relief (Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a) (1) for treble the United States' damages, in an amount to be determined at trial, and a penalty for each false claim presented;

(b)   On the First, Second, Third and Fourth Claims for relief, awarding Lisa Loscalzo her relator's share pursuant to 31 U.S.C. § 3730(d);

(c)   On the First, Second, Third and Fourth Claims for Relief, an award of costs and attorney's fees pursuant to 31 U.S.C. § 3730(d);

54

(d)    On the Fifth Claim for Relief, awarding Relator such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including:

    (1)    two times the amount of back pay with appropriate interest including pre-and post-judgment interest;

    (2)    compensation for special damages, including damages for emotional distress, sustained by Relator in an amount to be determined at trial;

    (3)    litigation costs and reasonable attorney's fees; and

    (4)    such punitive damages as may be awarded under applicable law,

(f)    On the Sixth Claim for Relief (violations of the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*), for treble the State of Florida's damages, in an amount to be determined at trial, and a penalty for each false claim presented;

(g)    On the Sixth Claim for Relief, awarding Lisa Loscalzo her relator's share pursuant to Fla. Stat. §§ 68.081, *et seq.*;

(h)    On the Sixth Claim for Relief, an award of costs and attorneys' fees pursuant to Fla. Stat. §§ 68.081 *et seq.*;

(i)    On the Seventh Claim for Relief (violations of the Florida False Claims Act, retaliation provision):

    (1)    Compensation for lost wages, benefits or other lost remuneration caused by the adverse action; and

(2)    Payment of reasonable costs and attorney's fees.

(j)    On the Eighth Claim for Relief (violations of the Minnesota False Claims Act, Minn. Stat. ch.15C.01, *et seq.*), for treble the State of Minnesota's damages, in an amount to be determined at trial, and a penalty for each false claim presented;

(j)    On the Eighth Claim for Relief, awarding Lisa Loscalzo her relator's share pursuant to Minn. Stat. ch.15C.01, *et seq.*;

(k)    On the Eighth Claim for Relief, an award of attorney's fees and costs, pursuant to Minn. Stat. ch.15C.01, *et seq.*;

(l)    On the Ninth Claim for Relief, awarding Relator such relief as is appropriate under the provisions of Minn. Stat. ch.15C.145 for retaliatory discharge, including:

(1)    two times the amount of back pay with appropriate interest including pre-and post-judgment interest;

(2)    compensation for special damages, including damages for emotional distress, sustained by Relator in an amount to be determined at trial; and

(3)    litigation costs and reasonable attorney's fees;

and

(m)    Awarding such further relief as is proper.

**JURY TRIAL IS DEMANDED**

Dated:   Largo, Florida
         January 9, 2023

United States of America, State of
Florida, State of Minnesota, *ex rel.*
Lisa Loscalzo, a Florida resident,

By: _____
     Audrey Hildes Schechter
     Law Offices of Audrey Hildes Schechter
     Florida Bar # 962589
     Andrea Fischer, Of Counsel
     Florida Bar # 1000345
     P.O. Box 445
     Largo, Florida 33779
     Telephone: 727-223-2178
     audreyschechterlaw@gmail.com


Copies furnished to:

Kelley Allen-Howard, AUSA
United States Attorney for the
Middle District of Florida
2110 First Street
Ft. Myers, Florida 33901

Kelley Allen-Howard, AUSA
United States Attorney for the
Middle District of Florida
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602

Jimmy Patronis
Chief Financial Officer
200 East Gaines Street
Tallahassee, FL 32399-0300

Attorney General
Civil Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Theresa Androff, Attorney
Office of Attorney General
State of Florida
**Medicaid Fraud Control Unit**
The Capitol PL-01
Tallahassee, FL 32399-1050

Office of Minnesota Attorney General Keith Ellison
445 Minnesota Street, Suite 1400
St. Paul, MN 55101